UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES HUCKLEBERRY,

    Plaintiff,                                                 Hon. Janet T. Neff

v.                                                              Case No. 1:11-CV-283

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 47 years of age on the date of the ALJ's decision. (Tr. 17, 98). He attended college for two years and worked previously as a carpenter. (Tr. 117, 125).

Plaintiff applied for benefits on January 16, 2008, alleging that he had been disabled since September 21, 2006, due to a lower back injury and left knee "problems." (Tr. 98-100, 116). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 47-97). On March 16, 2010, Plaintiff appeared before ALJ Daniel Dadabo, with testimony offered by Plaintiff and vocational expert, David Holwerda. (Tr. 22-46). In a written decision dated April 7, 2010, the ALJ determined that Plaintiff was not disabled. (Tr. 8-17). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-3). Plaintiff subsequently initiated this pro se appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On September 25, 2006, Plaintiff was examined by Dr. Eleanore Kue. (Tr. 369-70). Plaintiff reported that he injured his back at work the previous week. (Tr. 369). Plaintiff reported that "he thought that the pain was going to go away, but the pain has been increasing." (Tr. 369). Plaintiff further reported that "he has been taking over-the-counter medication and using heat and

3

ice without any improvement of his symptoms." (Tr. 369). An examination of Plaintiff's lumbar and sacral spine revealed "tenderness," but straight leg raising was negative. (Tr. 369-70). Plaintiff reported that he was "unable to bend because of the pain," but his gait was within normal limits and he was able to walk on his heels and toes. (Tr. 370). Plaintiff was diagnosed with a "strain" of his lumbosacral spine for which medication was prescribed. (Tr. 370). The doctor indicated that Plaintiff could return to work subject to the following restrictions: (1) no lifting more than 15 pounds; and (2) avoid repeated bending, stooping, and twisting. (Tr. 370).

On October 3, 2006, Plaintiff was examined by Dr. Richard Visser. (Tr. 340). Plaintiff reported that he was "feeling much better" and that his pain "is now down to a 2 from 9-1/2." (Tr. 340). Straight leg raising was negative and Plaintiff was "able to heel and toe walk easily." (Tr. 340). Plaintiff was able to "bend forward and touch his toes" and "twist[] easily from side to side." (Tr. 340). Plaintiff reported that "he has been able to do light duty-type work, and feels that he can resume his regular job without restrictions." (Tr. 340). Plaintiff was advised to continue his stretching exercises and take Tylenol as needed. (Tr. 340). The doctor concluded that Plaintiff "may resume regular work without restrictions." (Tr. 340).

On October 16, 2006, Plaintiff was examined by Dr. Kue. (Tr. 338-39). Plaintiff reported that after returning to work without restriction he re-injured his back lifting a machine. (Tr. 338). An examination of Plaintiff's lumbosacral spine revealed "tenderness," but no evidence of hematoma, contusion, or edema. (Tr. 338). Plaintiff was "unable to bend all the way down" and "complain[ed] of pain when twisting." (Tr. 338). Plaintiff's gait was "within normal limits" and

he was able to heel and toe walk. (Tr. 338). The doctor further observed that "Waddle's sign[1] is questionable." (Tr. 338). Plaintiff was diagnosed with a "strain" of his lumbosacral spine and prescribed medication. (Tr. 338). The doctor also imposed on Plaintiff the following restrictions: (1) no lifting more than 15 pounds; and (2) avoid repeated stooping, bending, or twisting. (Tr. 339).

On October 23, 2006, Plaintiff was examined by Physician's Assistant Richard Erard. (Tr. 333). Plaintiff reported that his lower back pain was "getting worse." (Tr. 333). Plaintiff exhibited "full range of [spinal] motion, but with tenderness." (Tr. 333). Straight leg raising was negative and Plaintiff was able to heel and toe walk without difficulty. (Tr. 333). Plaintiff's previously imposed work restrictions were continued. (Tr. 333). Plaintiff was also given 16 Vicodin tablets and instructed to take one per day at bedtime. (Tr. 322, 330).

On October 27, 2006, Plaintiff reported to Dr. Kue "requesting Vicodin." (Tr. 322). Plaintiff reported that he "ate all of the Vicodin in four days" and was still experiencing "persisting pain." (Tr. 322). On examination, Plaintiff was "able to bend down to 90 degrees." (Tr. 322). Plaintiff was able to heel and toe walk and straight leg raising was negative. (Tr. 322). Dr. Kue did not provide Plaintiff with Vicodin but instead prescribed ibuprofen and continued his previously imposed work restrictions. (Tr. 322)

On November 6, 2006, Plaintiff was examined by Physician's Assistant Erard. (Tr. 316). Plaintiff reported that he was still "very stiff, very painful." (Tr. 316). An examination of

---

[1] A positive Waddell's sign indicates that there exists a non-organic (i.e., psychological or psychosocial) component to an individual's lower back pain. *See, e.g., A New Sign of Inappropriate Lower Back Pain*, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504150/ (last visited on July 11, 2012); *Assessment and Management of Acute Low Back Pain*, available at http://www.aafp.org/afp/991115ap/2299.html (last visited on July 11, 2012); Gordon Waddell, M.D., *Waddell's Signs - Do they Mean Malingering?*, Disability Medicine, March-June 2004 at 38-39; Steven Greer, M.D. and Leslie Mackler, *What Physical Exam Techniques are Useful to Detect Malingering*, The Journal of Family Practice, August 2005 at 719-22.

Plaintiff's lower back revealed "tenderness" at L4-L5. (Tr. 316). Plaintiff exhibited "full range of motion" and straight leg raising was negative. (Tr. 316). Erard modified Plaintiff's work restrictions, concluding that Plaintiff could return to work subject to the following limitations: (1) no lifting more than 25 pounds; (2) no repetitive bending or twisting at the waist; and (3) no prolonged time in one position. (Tr. 316). Erard also prescribed additional Vicodin and instructed Plaintiff to participate in physical therapy. (Tr. 316).

On November 21, 2006, Plaintiff was examined by Physician's Assistant Erard. (Tr. 294-95). Plaintiff reported that he was "doing about the same." (Tr. 294). An examination of Plaintiff's lumbosacral spine revealed the following:

> There is no tenderness to palpation. There is full range of motion. Straight leg raise is negative. Deep tendon reflexes are positive and equal. Heel/toe walking is normal. Strength and sensation are intact.

(Tr. 294). Plaintiff's medications and work restrictions were continued. (Tr. 294).

On November 29, 2006, Plaintiff was examined by Dr. Sampson Ho. (Tr. 290-91). Plaintiff reported that he was "not entirely clear about his employment status." (Tr. 290). Specifically, Plaintiff reported that he "assisted [a] co-worker in welding a piece of metal." (Tr. 290). When Plaintiff's co-worker took "the welding material home" Plaintiff was "charged with accessory of theft" and later fired. (Tr. 234, 290). An examination of Plaintiff's lumbosacral spine revealed "focal tenderness in the right sacroiliac joint" and "a mild degree of tenderness along the paraspinal muscles, as well as the facet joint." (Tr. 291). Dr. Ho agreed that Plaintiff was suffering from a "back strain," noting that Plaintiff's "problem is mechanical and not neurological." (Tr. 291). The doctor modified Plaintiff's medication regimen and instructed him to participate in occupational therapy as well as physical therapy. (Tr. 291). Dr. Ho determined that Plaintiff could return to work

"full time" subject to the following restrictions: (1) no repetitive bending or twisting; (2) provide position changes between sitting and standing; and (3) no lifting more than 30 pounds. (Tr. 291).

On January 9, 2007, Plaintiff participated in an MRI examination of his lumbar spine the results of which revealed: (1) spondylolysis[2] at L5; (2) spondylolisthesis at L5-S1; and (3) retrolisthesis[3] at L4-5 with no central canal stenosis. (Tr. 272-73).

On January 24, 2007, Plaintiff was examined by Dr. Ho. (Tr. 269-70). With respect to Plaintiff's recent MRI examination, the doctor reported the following:

> The spondylolisthesis is an underlying condition. Current clinical presentation did not suggest nerve root involvement, so I think treatment should still be conservative. The pain that is produced is actually mostly at the sacroiliac joint, which I explained to [Plaintiff] is a mechanical problem and from the back strain. In his situation if surgery is to be considered it would involve lumbosacral spine decompression and fusion, which is a major procedure. I explained to [Plaintiff] the intension of treatment is really for spinal stability in the trunk. He is not able to tolerate anti-inflammatories, even in Celebrex, due to his ulcer disease, so I suggested we use Tylenol. I suggested he use no more than 4000mg per day. I explained to him that we have to gauge his progress by his pain symptoms, thus I would suggest not to use narcotics.

(Tr. 269).

On April 25, 2007, Plaintiff was examined by Dr. Daniel Mankoff with Michigan Pain Consultants. (Tr. 249-50). A physical examination revealed the following:

---

[2] Spondylolysis is a "defect in the connection between [the] vertebrae" which results from "a weakness in a section of the vertebra called the pars interarticularis, the thin piece of bone that connects the upper and lower segments of the facet joints." Spondylolysis, available at http://my.clevelandclinic.org/disorders/Back_Pain/hic_Spondylolysis.aspx (last visited on July 11, 2012). This defect "can lead to small stress fractures (breaks) in the vertebrae that can weaken the bones so much that one slips out of place, a condition called spondylolisthesis." The "initial treatment for spondylolysis is always conservative, and is aimed at reducing pain, permitting the fracture to heal, and returning the person to normal function." *Id.*

[3] Retrolisthesis refers to the "backwards slippage" of a vertebral body. Retrolisthesis and Lumbar Disc Herniation, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2278018/ (last visited on July 11, 2012).

> [Plaintiff] changes easily from a sitting to standing position. He is able to stand on his heels and toes. He can flex to approximately 75 [degrees] with increasing low back pain. Extension is non-painful. There is bilateral lumbar tenderness. Straight leg raising is negative. Reflexes are hypoactive. Sensation is intact. There is good range of motion at the hips.

(Tr. 249). The doctor administered to Plaintiff "an L5 transforaminal injection." (Tr. 250). On May 18, 2007, Plaintiff reported to Dr. Mankoff that "his left sided leg pain is essentially resolved," but that "he also continues to have low back pain that did not improve." (Tr. 248). Plaintiff was administered a lumbar epidural injection at L5-S1. (Tr. 248).

On May 30, 2007, Plaintiff reported to Michigan Pain Consultants because "he has run out of his Vicodin early for the second time since he has established a relationship here April 2007." (Tr. 247). Specifically, it was noted that Plaintiff had consumed 90 Vicodin tablets over the previous two week period. (Tr. 247). Plaintiff reported that "since [the Vicodin] doesn't help, he has been taking more than prescribed even though he doesn't feel that this is very beneficial either." (Tr. 247). Because this was Plaintiff's second violation of Michigan Pain Consultants opioid policy, Plaintiff was asked to provide a urine sample for drug screening purposes. (Tr. 247). On June 1, 2007, Dr. Mankoff authored the following letter to Plaintiff:

> At your last appointment, we did perform a urine drug screen on you. This came back as positive for benzodiazepines which are derivatives of Valium. Cannabinoids which is a metabolite of marijuana, as well as opioids which would be consistent with the Vicodin we have prescribed for you. When you were initially seen, you did not tell us that you were taking any type of benzodiazepine such as Valium. You also denied any use of street drugs. Given the fact that you have been using this, it is a clear violation of our medication policy and narcotic contract. As such, I will no longer be prescribing any type of analgesic or narcotic medications for you.

(Tr. 226).

On August 14, 2007, Plaintiff was examined by orthopedic surgeon Dr. James Wessinger. (Tr. 234-37). With respect to Plaintiff's gait, Dr. Wessinger observed the following:

> He stood without upper extremity assist but then he began to stagger and what looks like intentionally buckling his left knee as he ambulated. He complains of pain in his knee but his gait is quite non-organic. In fact, the weird buckling disappears when he toe and heel walks which he can do indicating excellent calf strength.

(Tr. 235). An examination of Plaintiff's lumbar spine revealed "no pelvic obliquity, scoliosis or other spinal deformity." (Tr. 235). Plaintiff exhibited "mild tenderness" at the lumbosacral joint, but there was no evidence of spasm or trigger points. (Tr. 235). With respect to range of motion, the doctor reported the following:

> Lateral bending, tru[n]k rotation and extension are within normal limits. Flexion, however, is limited to about 14 inches [from] finger [to] floor. This represents a modest restriction.

(Tr. 235). Plaintiff exhibited "normal" strength in his lower extremities and straight leg raising was negative. (Tr. 236). Dr. Wessinger concluded that "neurologically [Plaintiff] is intact" and "is not totally disabled." (Tr. 236-37). Specifically, the doctor indicated that Plaintiff "could work at a job where he did not have to repetitively bend or lift over 25-30 pounds" and "certainly he could do a job that did not require lifting and allowed him to sit as tolerated." (Tr. 236).

On February 7, 2008, Plaintiff completed a report concerning his activities. (Tr. 130-37). Plaintiff reported that he washes dishes, vacuums, watches television, walks, cares for his pets (two birds and one dog), prepares meals, washes laundry, and shops for groceries. (Tr. 130-37).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential process, Plaintiff bears the burden of proof through step four, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v.*

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

*Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) L4-5 lumbar spinal annular tear; (2) L4-5 and L5-S1 lumbar spondylolisthesis with stenosis; (3) status post April 2007 injection; (4) depression; and (5) alcohol and substance abuse, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 10-11). With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the physical ability to perform sedentary, unskilled work subject to the following limitations: (1) he can sit for up to 30 minutes continuously; (2) he can stand/walk, on level surfaces, for up to 15 minutes continuously; (3) he cannot climb ladders, ropes, or scaffolds; (4) he can only occasionally stoop, crouch, kneel, crawl, or balance; and (5) he cannot perform any "team coordination" activities. (Tr. 12).

The ALJ concluded that Plaintiff was unable to perform any of his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly,

ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert David Holwerda.

The vocational expert testified that there existed approximately 4,900 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 43-44). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act.

Plaintiff initiated the present action without benefit of counsel. While Plaintiff has submitted a "brief" in support of his appeal, he has failed to identify therein any error, mistake, or shortcoming in the ALJ's decision denying his claim for benefits. Despite Plaintiff's failure to assert any claim or issue that could entitle him to relief, the Court has thoroughly reviewed the record to determine whether the ALJ's decision suffers from any obvious defects or deficiencies. This review reveals nothing which calls into question the ALJ's decision making process, the legal standards he applied, or the substantiality of the evidence in support of his decision. Specifically, the Court notes that the medical evidence of record does not support Plaintiff's claim of complete disability. In fact, none of Plaintiff's care providers have imposed on Plaintiff limitations which are inconsistent with the ALJ's RFC determination. While the Court does not dispute that Plaintiff suffers from severe impairments which impose significant functional limitations, the ALJ's determination that there nevertheless exist a significant number of jobs which Plaintiff could perform despite his limitations

enjoys substantial support in the record.  Accordingly, the Court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within such time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  August 6, 2012

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge